The last case on for argument is Spencer v. Capra. The last case on the calendar, Jordan v. United Health Group, Inc., will take on submission. The question before the court today is very simple. Could a fair-minded jurist agree with the 11 state court judges that reviewed the evidence in this case and found that the constitutional error that occurred was harmless in light of the overwhelming evidence of the petitioner's guilt? And the answer to that question is yes. And so before we begin, let's talk about 2254d, 28 U.S.C. 2254d, which says that if before a federal court can award federal habeas relief to a state court defendant, then it must find that the state court's decisions that reviewed the claim and adjudicated that claim on the merits was objectively unreasonable. The Supreme Court has interpreted that to mean that no fair-minded jurist could agree with the state court decisions, the last state court decision to mend their judgment. Now in Davis v. Aiella, the Supreme Court also stated that when a state court says that a constitutional error occurred but it was harmless in light of the overwhelming evidence, that that constitutes a decision on the merits. So ergo, the only way that this district court could have granted federal habeas relief is if it found that no fair-minded jurist could agree with the state court decisions. And we see, and respectfully to the district courts, they applied the wrong standard. It applied the wrong standard. It substituted its own evaluation of the evidence. It substituted its own disagreement or its own findings of inconsistencies for that of the state courts. But this court itself has repeatedly said that mere disagreement with a state court decision is not enough to award habeas relief. It can't just be a disagreement, but it has to be unreasonable. Don't you consider, in making that determination, don't you also look at the nature of the constitutional harm? So here, I think your adversary would say that the constitutional harm here was that his client was prevented from putting on a defense, essentially a coherent alternative story. And it's very difficult to evaluate whether an alternative story could or could not have an impact on a jury. Can you really say, you know, I could imagine many scenarios in which the blocking the defendant from putting on a defense, I would say, is keeping, I could, all fair-minded jurists would say, I can't say that that's harmless. And that may be the case, but that's not the case that we have here. The defendant, the defendant was not, I'm sorry, I'm going to use defendant, I'm used to it. The defendant was not prevented from putting on defense. He was not, he was prevented from putting on extrinsic motive evidence that led to his defense. He testified as evidence of a witness is extremely important, you know, the Supreme Court has said it's able, the motive of the witness who's testifying, the motive at the time of the crime to have been, this is not insignificant evidence. Right. I'm not saying, and I'm not saying it wasn't insignificant. What I'm saying is that he was able to put on his defense that he was framed, that he, that this event went. We know that the error, that the, even the state court said, okay, the error wasn't harmless, right? No, the state court did say the error was harmless, Your Honor. I'm sorry, but they said it was an error, right? I'm sorry, I think I corrected. They said it was an error. So they, when you say, well, you know, it wasn't that important, he put on defense. They said, no, it was an error. It affected his defense. So they made that determination, right? I apologize. I apologize if I misspoke. I didn't say, I wasn't trying to say that he wasn't able, it wasn't important. What I was trying to say was that he was able to put on a defense. He put on his defense that he was framed, that this event occurred because the complainant actually jumped him. Without this evidence, that defense didn't make much sense. Well, there was other evidence that he could have provided, but he didn't, that would have supported his defense. For example, in his testimony, he testified that he was visiting his friend when Officer Palmer jumped him, and that during the incident, another friend came up to him and he said, you know, I'm being attacked, go get my mother. But neither of these two friends testified at trial. Neither of these two friends that he placed at the scene testified on his behalf at trial. So I think when we're looking at the effects of the preclusion of this mode of evidence, we also need to look at what's the likelihood that this evidence, if it had been presented, would have actually been successful. In light of the fact that this was just entirely self-serving evidence, this was an implausible story that this officer jumped him in broad daylight, pointed a gun at his head, and planted a gun. Then his wife comes along and spontaneously calls, now with very little communication between the two, he is able to communicate to his wife to call the police, conjure up the story, throw in a bribery allegation just for good measure, and then we have another 9-1-1 call from the mother-in-law. So we have this implausible defense that was already raised. So in other situations, I don't disagree with the general principle that... So, Mr. Yu, did the appellate division make a determination as to the implausibility of what it was that was proffered? Neither the appellate division nor the Court of Appeals did. But I think we can look at, they both said in light of the overwhelming evidence of this case, that the error was harmless, and when we look at the overwhelming evidence, when we consider both sides, the people's version of events, where we had five witnesses, including a disinterested witness that this court recognized was disinterested, as well as two corroborating 9-1-1 calls versus just one defendant testifying on his own behalf, and the Supreme Court in Skidmore versus South Carolina also recognized that juries would be skeptical of defendants who testify of the self-serving testimony when they present on their own behalf. When we talk about that, going back to the district court's error, I want to talk about that disinterested witness. And we see the error of the district court made clear when it kind of summarized the testimony of Janice Tinsley, the disinterested witness. She testified on direct examination that, you know, she was sitting in her car, she saw a man jump out of the car behind her, punch her neighbor in the face, and then pull out a gun. When she saw the gun, she ducked under and called her dad to call 9-1-1. When she went back up, the police were there, and the defendant was gone. She did not see that man anymore. The district court interpreted that to mean that she testified that the defendant fled. That's not what she testified to at all. She just testified that she assumed that he was arrested, but admitted that she could not see the defendant after she got back up. So she did not actually testify that he fled, but the district court interpreted it like that, that that's what she testified to. But a fair-minded jurist could have a different interpretation of her testimony, just like a fair-minded jurist could interpret the minor inconsistencies in the other people's, in the other witness' testimony as simply that, as simply minor. It didn't really make a difference whether they were in the front yard or the back yard when the incident started. It didn't really make a difference whether they were fixing cars when the incident started. All five witnesses, including the disinterested one, all testified to the same sequence of events, and their testimony was corroborated by two 911 phone calls that happened at the time. There are references in the briefs, and I haven't listened to the 911 calls in preparation for today. The references to the briefs, to the contents of the call by the wife, are you familiar with the contents of the call by the brother-in-law? Yes, I am, Your Honor. I'm sorry, Judge. What were they? It was a complaint for the jury, right? Yes, it was, Your Honor. The contents of the brother-in-law, what happened, the 911 call for the brother-in-law happened a little after the incident occurred. So the wife, one, occurred as Officer Palmer was holding the defendant down, you know, after he took his gun away, and during when the bribery attempt was made. So you hear her say, you know, he's not that kind of police officer, don't do that, you know, don't throw the money at him. The 911 call from the brother-in-law speaks in terms of slightly past tense. So he says, so this man just appeared in front of me, just appeared in my house, he just pulled out a gun, he's on the floor, the officer has got him on the floor, the officer's in plainclothes. So it occurred moments after the incident occurred. I know my time is up, but I do just want to, actually, I'll save the rest for rebuttal. Thank you very much. Thank you, Mr. Yee. Mr. Levitt? Yes, good afternoon, Your Honors. I think Judge Livingston made an important point, and the point is that it is difficult when evidence of a defense is excluded to really calculate how it may have affected the jury's consideration of the case. However, this Court is not without guidance. For example, this Court has said several times, one of the cases of which we cite, Zappullo v. New York, the prosecution knows intimately the strengths and weaknesses of its case, and its exploitation of error is therefore a relevant consideration in determining prejudice. So what we have here is a prosecutor who understood that the defense, both during the cross-examination of the people's witnesses and during the testimony of the defendant himself, was using a frame-up  yet knowing that and understanding the relevance of that, she argued vociferously to keep it out, saying, really, what you're only trying to do is dirty up this police officer. And she got the Court to go along with her arguments, and having done that, she cynically exploited it during summation, so you can see exactly how important she thought it was. So she told the jury during summation, at page 599, now defendant did give an opening statement, he opened with a wild and wacky story about drugs and drag racing, all kinds of stuff, and some fantastic close relationship, and he didn't support it with a single shred of evidence. Then also on page 599, remember this claim that there is a frame-up, so what does the defendant rely on? And then on page 602, three pages later, Spencer was, quote, the only person who was an interested witness as a matter of law, unquote, and then on page 603, one page later, he has a motive to lie that no one else has in this case. And then on page 604, why on God's green earth would they frame him? It was an extraordinarily cynical strategy that the people pursued in this case, and then it got the benefit of bolstering from the court's jury instructions, where the court instructed the jury, as I previously instructed you, arguments made by counsel during their openings, during summation, are not evidence, and then the court instructed, how do you assess a witness's credibility? Well, did the witness have a bias or hostility that was evident in the manner in which they testified? Did they have a motive to lie? But as your adversary says, the district court was wrong that you think in saying that this case wasn't overwhelming. I mean, we have three witnesses who testified to the events that Officer Palmer was punched in the face and that your client drew a gun. We have an independent witness who saw the events, doesn't identify your client, but testified to the same chronology. And your client's testimony at the end of their brief, if I'm understanding this correctly, your client's testimony on the stand was self-contradictory. So he said someone came up to him and he said, go get help, this is a dirty cop, and then he later testified that he only found out that Officer Palmer was a police officer later when the other police arrived. Sure. The first, with regard to the people's witnesses, this is the total, the total testimony of Ms. Tanksley concerning her narrative of the events. And I can read it in 10 seconds. I saw a gentleman go over, jump out of a truck, go over to my neighbor, punch him in the face, and then I saw a gun and then I ducked down. That's on page 227. That is the entirety of her testimony. We don't know how she got there. We don't know what else she saw. Nobody else talks about her whatsoever. It has every appearance of being a rehearsed piece of testimony. Now, is a jury allowed to consider it? Of course a jury is allowed to consider it. But that's not the issue here. The issue is when you totally remove a defendant's right to present an overarching defense, and that's what this was, because this defense, if believed, would have explained everything in the people's case. And the people point to the 9-1-1 evidence where the police officer's wife talks about a bribe on the 9-1-1. There's no bribe money in the case. Where's the money? You have Mr. Blackman, who claims he's watching the entire scene unfold, the entire scene unfold, and he sees no bribe money. And then you have a police officer come who dusts the car of the defendant for fingerprints, but he's not asked. He's not asked by this officer to dust the gun for fingerprints. So you have no dusting of the gun for fingerprints, even though it was the obvious and logical thing to do, and the cops were there to dust things for fingerprints. You have absolutely no money, although there's a claim of a bribe supposedly just went into the wind. Ms. Tanksy's testimony, the court for testimony is all of three lines long. Mr. Levitt, isn't the standard a real problem for you, though, because while it's fair to say, perhaps, that a reasonable jurist could find that this was not harmless, why is it not also fair to say that a reasonable jurist could find that it was harmless? It's all about, you know, not what's right, but what's reasonable, right? Let's talk about two things. First, let's talk about the standard very briefly. And what this court has said on numerous occasions in discussing this standard on a habeas is that although the increment of error must be higher than it generally would be on direct appeal, quote, the increment need not be great because otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence. So we're not talking here about an insurmountable standard. We're talking about a standard certainly which is higher, but it's not an insurmountable one. And in fact, in numerous of this court's cases, which we cite, Zappullo was one of them, Brown v. Keene was another one of them, Wood v. Ercol was a third, all of which we cite, this court undertook exactly the same kind of analysis that Judge Kogan did and came to exactly the same conclusion that the errors that occurred in those cases were not harmless under the habeas standard. So yes, I agree with you. It's a heightened standard, but it's not an impossible standard. And when you were describing all the things that the prosecutor said about self-serving and not a shred of evidence and no one should believe this guy with the story he tells, it's fantastic, wouldn't she have said the exact same things if he were allowed to testify since he was the only evidence of this? First, it wasn't just his testimony. It was also an attempt to do a searching cross-examination of Officer Palmer and Mr. Blackman. And she was precluded doing that as well. So we're not just talking about his direct testimony, we're talking about cross-examination, which is what a trial is about, after all, cross-examination of the people's witnesses as well, and defense counsel was precluded from doing that. It is extraordinary that the people can so cynically exploit an error that they created and they got away with it in the state court, but they shouldn't get away with it in the federal court. The testimony of these various witnesses were contradictory in very material respects. It was material that there was a claim that money was literally taken out of my client's and talked about on the 9-11, and Mr. Blackman didn't even see it. It's your contention that the standard is we have a reasonable jurist, an unreasonable jurist, but we don't have to reach the incompetent jurist. So what's an unreasonable jurist? Why do we know something is unreasonable? Because you have here a case where a defendant was denied the right to present a defense which, if believed by the jury, would have resulted in acquittal. It's as simple as that. And as Judge Livingston said, we'll never know for sure. But the only reason we'll never know for sure is because everybody acknowledges that he was denied his right to present a defense. So not only did the people exploit their cynical strategy here, but now they're arguing that because we couldn't present a defense, this court should just assume, therefore, that reasonable people can differ and a jurist may have said reasonably that this was not prejudicial under the AEDPA standard, notwithstanding that this court in several other cases has done a similar analysis, no stronger for the habeas petitioner, frankly, and yet found that those petitioners were denied their constitutional rights and were granted a new trial. Mr. Levin, what do we do about the ineffective assistance of counsel argument? Well, I hope nothing, Your Honor, because I hope that what you do… You shall receive. Yes. If you affirm the decision below, then obviously there's nothing for the court to do about the ineffectiveness argument. Right, right, right. If you reverse the decision below, then of course the court would remand for consideration of any remaining claims in the petition, which principally is the ineffectiveness of counsel. You don't have to have made that as an alternative argument to us having made it before in the district court. I'm sorry, Your Honor? You do not have to have made that as an alternative argument to us having already made it. No, because it's fact-based. It would require an evidentiary hearing.  Thank you, Your Honor. Thank you. Mr. Yee? You have the same view on the ineffective assistance of counsel? Yes, Your Honor. I would ask that it be remanded for the district court so it can issue a decision on that. Right. Just very briefly. I'm not going to stay here all day. You're darn right. I got a minute, 45. I'm not here to defend the prosecutor, what the prosecutor did, or the police work in this case. I'm not. What I'm here to defend is the state court's evaluation of the evidence. The state court, presumably impartial judges, reviewed all the evidence in this case, as well as the defense proper testimony, and they determined that the error was harmless. And I would submit that a fair-minded jurist could agree with that determination. As long as the fair-minded jurist could agree, then this court, or this court should have, given the principles of criminalism and comedy, respected that decision. My adversary also went at length and discussed, to talk about the briefness of Janice Tingsley's testimony, that he said he could stay up here and recite it in a minute. I would argue that's quality, not quantity that matters. This Tingsley was, she was up there. She was up there for cross-examination, and the defense counsel could have asked her, well, what do you see? What did you not see? You know, why were you there? But none of those questions came out. The relevant portions of her testimony were made crystal clear. She witnessed the events as the four other people's witnesses who witnessed the events testified to. Unless there are any questions from this court, otherwise, thank you very much. Thank you both. As I said earlier, Jordan v. UnitedHealth Group, Incorporated. Our last case is on submission, so I will ask the clerk please to adjourn.